FILED'06 MAR 21 11:27USDC-ORE

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA,                    No. CR 05-60055-01-AA

      Plaintiff,

                                     OPINION AND ORDER

   v.

JOSE JESUS CAMACHO-HERNANDEZ,

      Defendant.

_____

Frank Papagni
Assistant United States Attorney
701 High Street
Eugene, OR 97401
    Attorney for plaintiff

John Storkel
1415 Liberty Street S.E.
Salem, OR 97302
    Attorney for defendant

AIKEN, Judge:

    Defendant is charged with possession with intent to distribute

1    - OPINION AND ORDER

methamphetamine and conspiracy to possess with the intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 846.  Defendant moves to suppress statements obtained as a result of his interrogation on April 6, 2005.  Defendant claims that these statements were obtained in violation of his rights under the Fifth and Sixth Amendments to the United States Constitution and Article 36 of the Vienna Convention on Consular Relations.  The government opposes the motion on the ground that defendant knowingly waived his rights to remain silent and to counsel, and that defendant provided his statements voluntarily.

On March 2, 2006, the court heard oral argument and received testimony from several witnesses.  Defendant's motion is denied.

FACTS

On March 9, 2005, agents from the Drug Enforcement Administration and officers of the South Coast Interagency Narcotics Team (SCINT) executed a federal search warrant at the residence of Sheryl Bravo located at 91437 Wayfarer Lane in Coos Bay, Oregon.  Approximately two pounds of methamphetamine was seized from Bravo's residence.

After being advised of her Miranda rights, Bravo described her participation in a drug trafficking conspiracy with a person named "Fito Rivera," whose real name is Juan Arnulfo Elizarrarz-Rivera. Bravo informed agents that Rivera was involved in transporting large quantities of methamphetamine from Phoenix, Arizona to Coos

2    - OPINION AND ORDER

Bay, Oregon and Atlanta, Georgia.  Bravo told officers that she obtained methamphetamine from Rivera, and that defendant Camacho-Hernandez would deliver the drugs from Rivera to her or her brother.  After Bravo's brother sold the methamphetamine, Bravo would send cash payments to Rosa Maria Rivera, purportedly Rivera's sister, in Phoenix.  Bravo agreed to cooperate with law enforcement agents.

On March 29, 2005, Bravo had a telephone conversation with Rivera.  Rivera stated that he knew of the drug trafficking arrests in Coos County and that police had seized two pounds of methamphetamine from Bravo.

On April 4, 2005, Rivera telephoned Bravo and informed her that a delivery of methamphetamine would be delayed because his "cook" had been arrested.  Rivera asked Bravo if she would arrange for defendant to drive a vehicle to Stockton, California, where Rivera would give defendant three pounds of methamphetamine for delivery to Bravo.  However,  Rivera  agreed to deliver the methamphetamine himself after Bravo promised to pay him on delivery for two of the three pounds of methamphetamine and to drive him to the Portland airport.

On April 6, 2005, after several telephone calls to Rivera, Bravo called defendant and confirmed that Rivera was at defendant's residence.  Bravo informed defendant that she was at a Motel 6. Bravo and Detective Buddy Young later observed Rivera and defendant

3   - OPINION AND ORDER

in a green Dodge pickup in the Motel 6 parking lot.   Rivera was
driving and defendant was the passenger.   After about ten minutes,
they left the parking lot.

Bravo later called Rivera, and Rivera told her that he would
be at the motel in ten minutes.   River and defendant subsequently
arrived and entered Bravo's room.   Their statements were recorded.

Rivera told Bravo that he left the methamphetamine somewhere
else and asked for payment of the money.   Rivera told Bravo that he
would forgive the debt owed for the methamphetamine taken by the
police and warned her to be more careful in the future.   Rivera
told Bravo that it would take twenty or thirty minutes to deliver
the methamphetamine.

Rivera also told Bravo that she would need to trust defendant,
because defendant sometimes would deliver the methamphetamine
instead of Rivera.   Bravo asked if defendant had a driver's
license, and defendant replied that his cousin did.   Rivera assured
Bravo that she could pay defendant for methamphetamine, because
Rivera trusted that defendant would give him the money.

Bravo, Rivera, and defendant discussed where they could
deliver the three pounds of methamphetamine.   Bravo suggested that
they call her after they had the methamphetamine and she would meet
them.   Rivera and defendant agreed and left Bravo's motel room.
When they reached the pickup in the parking lot, Rivera and
defendant were arrested.

4    - OPINION AND ORDER

Detective Young advised defendant of his <u>Miranda</u> rights in Spanish in the presence of Agent Nyfeler. Detective Young asked if defendant wanted to speak with them, and defendant nodded his said and said, "Yes."

North Bend Police Officer Scott Brennan, who speaks conversational Spanish, first interviewed defendant along with DEA Agent Nyfeler. Officer Brennan advised defendant of his <u>Miranda</u> rights in Spanish and asked defendant if he understood his rights, and defendant said that he did. Officer Brennan asked if defendant was willing to answer questions, and defendant said that he was. After defendant stated that his address was 3533 Chester Street in North Bend, Detective Young left to prepare an affidavit to support a warrant to search defendant's residence.

Agent Nyfeler determined that he was unable to question defendant further without the assistance of a professional interpreter. Sandra Klineman, a native Spanish speaker employed by the Oregon Department of Human Services in Coos Bay, arrived three hours later. The government maintains that defendant was provided food and water and allowed to use the restroom while they waited for Ms. Klineman.

When Ms. Klineman arrived, Agent Nyfeler asked defendant if he remembered his <u>Miranda</u> rights as previously read to him, and defendant stated that he did. Further, Agent Nyfeler offered to re-administer his <u>Miranda</u> rights, but defendant said that he did

not need them read to him again.

Upon questioning by Agent Nyfeler, defendant first denied any involvement and stated that he knew nothing about a narcotics transaction. Defendant said that the first time he had seen Rivera was earlier that day before they arrived at the Motel 6.

Agent Nyfeler then played the tape-recorded conversation between defendant and Bravo earlier that day, in which defendant stated that Rivera was asleep at defendant's home. Defendant admitted that Rivera had arrived at his home in the middle of the night, and that he was aware of the drug transaction planned with Bravo. Defendant said that he accompanied Rivera to help complete the transaction and complained that Rivera was only paying him $30 in gas money for his assistance.

Defendant stated that he and Rivera had gone to the Motel 6 to ensure that Bravo was there before they risked transporting the methamphetamine. After meeting with Bravo, defendant and Rivera intended to retrieve the methamphetamine and deliver it to Bravo at the motel to complete the transaction.

Defendant would not tell Agent Nyfeler where the three pounds of methamphetamine was located. However, defendant admitted that he worked for Rivera by transporting methamphetamine to Coos Bay, and that Rivera was a "big-time" methamphetamine dealer who also sold large quantities of methamphetamine to dealers in Idaho.

///

6    - OPINION AND ORDER

DISCUSSION

A. Knowing and Voluntary Waiver of Rights

Defendant argues that his statements were obtained in violation of his constitutional rights, because he did not understand that he could have an attorney present before he provided statements to law enforcement officers. Specifically, defendant maintains that he not did understand his Miranda rights when given by Detective Young and Officer Brennan, and that he was not advised of his rights again before Agent Nyfeler began interviewing him with Ms. Klineman's assistance.

"For a waiver of rights to be valid it must be voluntarily, knowingly, and intelligently given. Whether there has been a valid waiver depends on the totality of the circumstances, including the background, experience, and conduct of defendant." United States v. Doe, 155 F.3d 1070, 1074 (9th Cir. 1998) (en banc) (internal quotation marks and citations omitted). However, "[w]aivers of Miranda rights need not be explicit; a suspect may impliedly waive the rights by answering an officer's questions after receiving Miranda warnings." United States v. Rodriguez-Preciado, 399 F.3d 1118, 1127 (9th Cir. 2005)

Here, defendant was twice provided with Miranda warnings in Spanish, and defendant indicated that he understood his rights and agreed to speak with law enforcement officers. Further, when Agent Nyfeler began interviewing defendant with the assistance of Ms.

7    - OPINION AND ORDER

Klineman, Agent Nyfeler reminded defendant of his rights and offered to re-administer <u>Miranda</u> warnings to defendant. According to Agent Nyfeler and Ms. Klineman, defendant refused Agent Nyfeler's offer and stated that he remembered and understood his rights.

Further, the three-hour passage of time between the time defendant initially was provided with <u>Miranda</u> warnings and the time Ms. Klineman arrived does not render defendant's waiver unknowing. The Ninth Circuit has held that "rewarning is not required simply because there is a break in questioning." <u>People of the Territory of Guam v. Dela Pena</u>, 72 F.3d 767, 769 (9th Cir. 1995). Further, the court found that a lapse of fifteen hours did not render earlier <u>Miranda</u> warnings ineffective when nothing suggested that the effectiveness of the earlier *Miranda* warnings was diminished, and the officers had reminded the defendant of the earlier warnings. <u>Id</u>. Likewise, after Ms. Klineman arrived Agent Nyfeler reminded defendant of his rights and offered to provide them again.

Finally, no evidence suggests that defendant's statements to Agent Nyfeler were given involuntarily. "In evaluating voluntariness, the test is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." <u>United States v. Male Juvenile</u>, 280 F.3d 1008, 1022 (9th Cir. 2002) (citation and internal quotation

marks omitted). Thus, the court looks at the circumstances surrounding the statements and the combined effect of the officers' course of conduct. See United States v. Polanco, 93 F.3d 555, 560 (9th Cir. 1996).

In find that neither Detective Young, Officer Brennan, nor Agent Nyfeler engaged in coercive tactics when questioning defendant. Defendant was advised of his Miranda rights and does not dispute the government's contention that he was given food and water and allowed to use the restroom while they waited for Ms. Klineman. With the assistance of an interpreter, defendant agreed to speak to Agent Nyfeler, and Ms. Klineman testified that defendant was treated professionally and with respect. Therefore, I find that defendant knowingly and voluntarily waived his Miranda rights when speaking to law enforcement officers, and that his statements were voluntary.

B.  Violation of the Vienna Convention

Defendant also argues that his statements should be suppressed, because officers failed to inform him of his right to contact his foreign consular. Defendant maintains this failure violated of Article 36 of the Vienna Convention on Consular Relations, April 24, 1963, 21 U.S.T. 77, which requires that law enforcement officials to notify arrested foreign nationals of their right to contact their consulates. Rodriguez-Preciado, 399 F.3d at 1129. Here, it is undisputed that defendant was not so informed.

9    - OPINION AND ORDER

Regardless, according to the law of this Circuit, suppression is not an appropriate remedy for violations of Article 36. Id.; United States v. Lombera-Camorlinga, 206 F.3d 882, 885 (9th Cir. 2000) (en banc) ("We agree with the government's alternative position that assuming that some judicial remedies are available for the violation of Article 36, the exclusion in a criminal prosecution of evidence obtained as the result of post-arrest interrogation is not among them."). Therefore, even if officers failed to notify defendant of the right to contact his foreign consulate prior to interrogating him, such failure does not support suppression of his statements.

CONCLUSION

For the foregoing reasons, defendant's Motion to Suppress Statements (doc. 20) is DENIED.

IT IS SO ORDERED.

Dated this _20_ day of March, 2006.

_____
Ann Aiken
United States District Judge

10   - OPINION AND ORDER